**Farrish M. PURCE, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 83–222.

District of Columbia Court of Appeals.

Argued Dec. 15, 1983.

Decided Oct. 1, 1984.

---

Marjorie E. Murphy, Washington, D.C., appointed by this court, for appellant.

John H. Palmer, Jr., Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty., Washington, D.C., at the time the brief was filed, Michael W. Farrell, Thomas J. Tourish, Jr., Robert J. Behm, and Terence J. Keeney, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before TERRY and ROGERS, Associate Judges, and KERN, Associate Judge, Retired.[*]

TERRY, Associate Judge:

Appellant was convicted of carrying a pistol without a license,[1] possession of an unregistered firearm,[2] and possession of unregistered ammunition.[3] On appeal he challenges only the trial court's denial of his motion to suppress evidence. We find his challenges without merit and affirm the conviction.

[*] Judge Kern was an Associate Judge of the court at the time of argument. His status changed to Associate Judge, Retired, on May 25, 1984.

[1] D.C.Code § 22–3204 (1981).

[2] D.C.Code § 6–2311 (1981).

[3] D.C.Code § 6–2361(1981).

## I

Shortly before sunrise on a Sunday morning in October 1982, at about 6:45 a.m., Officer Sal Lauro of the United States Park Police was patrolling near the Carter Barron Amphitheater in Rock Creek Park when he decided to make a routine check of the amphitheater's parking lot. The lot is used by several bus companies to pick up and discharge passengers who take overnight trips, and as a result unattended automobiles are frequently left in the lot for extended periods of time. Officer Lauro knew that there had been recent larcenies from some of these parked cars, so he drove through the lot to make sure that "everything was okay." There were about forty or fifty cars in the lot, and in one of them Officer Lauro discovered appellant seated in the right front seat. His eyes were closed, and his head was slumped to one side. He appeared to be either asleep or unconscious. The officer stopped his cruiser about ten feet away from the car in which appellant was sitting. By radio he checked its license number through the police computer to see if it had been reported stolen. He found that it had not been, but he also found that it was registered to a female owner.

Officer Lauro then got out of his cruiser and walked over to the car with a flashlight in his hand. He tapped on the window next to appellant to find out whether he might need some assistance. At the sound of the tapping appellant woke up. The officer asked him to roll down the window; when he did so, Lauro asked him for some identification and an explanation of what he was doing there. Appellant replied that he was waiting for his girl friend to return from a bus trip, but he failed to identify himself, so the officer asked him again for identification. Appellant began to rummage through his pockets and the glove compartment of the car while Officer Lauro waited

for a response. As he stood there next to the car, the officer saw a package of cigarette papers and a brown manila envelope, of the sort "commonly used to package marijuana," lying on the console between the two front seats. He asked appellant to hand him the envelope and the cigarette papers, and appellant passed them to the officer through the open window. Officer Lauro then asked him a third time for identification, and at the same time he opened the envelope, looked inside, and recognized its contents by sight and smell as marijuana.

After asking appellant a fourth time for identification, Officer Lauro spotted what appeared to be a "small telephone book"[4] in appellant's back pocket when appellant leaned forward. Thinking that he was attempting to conceal his identity, Officer Lauro ordered him to get out of the car so that he could examine what was in his back pocket. Appellant stepped out of the car without his shoes on. As he leaned back into the car to get them, the officer shined his flashlight into the front seat area and saw what appeared to be the butt of a gun protruding from under the floor mat on the passenger's side, where appellant had been sitting. Lauro grabbed appellant and took him to the rear of the car, where he patted him down for weapons but found none. He then went back to the open front door, reached into the car, lifted the floor mat, and found a .22 caliber automatic pistol loaded with six rounds of ammunition. Officer Lauro placed appellant under arrest, searched him, and found eight more rounds of ammunition for a .22 automatic in his pocket. Appellant then told the officer that he had the gun for protection because he had to wait in a dark parking lot for his girl friend.

Appellant moved to suppress the gun, the ammunition, and the statement.[5] The

---

4. We assume that the officer meant a pocket-sized address book rather than a telephone directory.

5. Appellant was not charged with possession of marijuana, apparently because the amount of marijuana in the envelope was too small to meet prosecution guidelines.

trial court denied the motion on the ground that the officer had seen the gun in plain view when appellant got out of the car, and that the gun gave him probable cause to arrest appellant. We affirm the denial of the motion, but on different grounds.[6]

## II

Appellant's principal contention is that Officer Lauro's request for identification constituted a detention or seizure, and that it was unlawful because the officer had no articulable suspicion that appellant had committed or was about to commit a crime. The government argues, to the contrary, that the officer's request was not a seizure, a detention, or even a stop. We think the government has the better argument.

This court has intimated on several occasions that a police officer's request for identification does not invade rights protected by the Fourth Amendment. *E.g., Sanders v. United States,* 339 A.2d 373, 376 (D.C.1975); *United States v. Lee,* 271 A.2d 566, 567–568 (D.C.1970). *See also United States v. Wylie,* 186 U.S.App.D.C. 231, 236–237, 569 F.2d 62, 67–68 (1977), *cert. denied,* 435 U.S. 944, 98 S.Ct. 1527, 55 L.Ed.2d 542 (1978) (distinguishing between mere police-citizen "contacts," which are not subject to Fourth Amendment limitations, and investigative stops). Only when there is some restraint on a person's liberty, either by force or by a show of authority, is there a seizure of that person. *Terry v. Ohio,* 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968). Very recently the United States Court of Appeals for this circuit has held, in a case quite similar to this one, that "as a matter of law, a request for identification cannot constitute a show of authority sufficient to convert an innocent encounter into a seizure." *United States v. Castellanos,* 235 U.S.App.D.C. 277, 281, 731 F.2d 979, 983 (1984). We agree with that holding and adopt it in this case.

The Supreme Court was confronted with this question in *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). In that case two drug enforcement agents saw the defendant alight from a plane at the Detroit airport. After concluding that her conduct fit the so-called "drug carrier profile," the agents approached her, identified themselves, and asked to see her identification and airline ticket. In rejecting the argument that this encounter had amounted to a seizure of her person, Justice Stewart observed that a seizure occurs "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id.* at 554, 100 S.Ct. at 1877 (footnote omitted).

> Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.

*Id.* (citations omitted). Justice Stewart then concluded:

> On the facts of this case, no "seizure" of the respondent occurred. The events took place in the public concourse. The agents wore no uniforms and displayed no weapons. They did not summon the respondent to their presence, but instead approached her and identified themselves as federal agents. They requested, but did not demand to see the respondent's identification and ticket. Such conduct, without more, did not amount to an intrusion upon any constitutionally protected interest. The respondent was not seized simply by reason of the fact that the agents approached her, asked her if she would show them her ticket and identification, and posed to her a few questions.

**6.** It is well settled that an appellate court may affirm a decision for reasons other than those given by the trial court. *See Garrett v. Wash-ington Air Compressor Co.,* 466 A.2d 462, 464 n. 5 (D.C.1983), and cases cited therein.

Nor was it enough to establish a seizure that the person asking the questions was a law enforcement official.... In short, nothing in the record suggests that the respondent had any objective reason to believe that she was not free to end the conversation in the concourse and proceed on her way, and for that reason we conclude that the agents' initial approach to her was not a seizure.

*Id.* at 555, 100 S.Ct. at 1877–78 (citation omitted).

Although this view did not command the support of a majority of the Court, it was not rejected by a majority either.[7] Several courts since *Mendenhall* have found Justice Stewart's reasoning persuasive, even though it is not binding precedent. In particular, courts have considered his list of "examples," quoted above, in deciding whether a particular police-citizen encounter amounted to a seizure. *E.g., United States v. Sugrim,* 732 F.2d 25, 28 (2d Cir. 1984); *Ware v. Reed,* 709 F.2d 345, 349 (5th Cir.1983); *McShan v. State,* 155 Ga.App. 518, 271 S.E.2d 659 (1980).[8] Our own decisions, both before and after *Mendenhall,* show that we have followed the same approach.

Two cases, decided at almost the same time, illustrate how we have dealt with requests for identification by police officers. In *Crowder v. United States,* 379 A.2d 1183 (D.C.1977), two police cars pulled up to the scene of a crap game at 4:30 a.m. Most of the participants fled, but Crowder and two others remained behind. One of the officers approached and asked Crowder for identification, and at that point he became very nervous. He was holding a newspaper under his arm which he tried to keep out of the officer's view. Fearful that a weapon might be hidden inside the newspaper, the officer squeezed it and felt the outline of a gun. We held that the police conduct fell within the purview of the Fourth Amendment from the moment of the officers' arrival:

In this case, three policemen alighted from two squad cars near where Crowder was standing, and one of the policemen demanded identification from him. This was a show of authority sufficient to restrain appellant's liberty, and is consequently a "seizure" within the meaning of *Terry [v. Ohio, supra ].*

*Id.* at 1185.

Less than two months later, in *Harris v. United States,* 382 A.2d 1016 (D.C.1978), we found no seizure in a police request for identification. In that case two police officers saw Harris leaving a parking lot at 1:20 a.m. carrying a guitar case and a tape deck. Knowing that there had been several larcenies from automobiles in that area, the officers got out of their cruiser, stopped Harris, and asked him whether he had parked his car in the lot. He replied that he had, and that he was on his way home. When one of the officers asked him for identification, Harris said that his identification was in his car and started to walk toward one of the cars in the parking lot. The officers went with him. As all three were standing next to the car, Harris said that he did not have the keys because he

---

**7.** *Mendenhall* was a 5–4 decision. Justice Stewart's opinion was for the most part the opinion of the Court, but on this particular point he wrote only for himself and one other justice. The other three justices in the majority concluded that the agents had a reasonable suspicion that the defendant was engaging in a criminal activity when they approached her, so that their questioning her in the airport was justified as an investigative stop under *Terry v. Ohio, supra.* These three justices therefore did not reach the issue of whether merely asking for identification in a public place invades Fourth Amendment rights, although they did "not necessarily disagree with the views expressed" by Justice Stewart on the subject. *United States v. Mendenhall, supra,* 446 U.S. at 560 n. 1, 100 S.Ct. at 1880 n. 1 (Powell, J., concurring). *See also Florida v. Royer,* 460 U.S. 491, 497–498, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983) (plurality opinion).

**8.** *McShan* was a companion case to *Mendenhall* in the Supreme Court. A few days after *Mendenhall* was decided, the Court remanded *McShan* for reconsideration in light of the *Mendenhall* opinion. *McShan v. Georgia,* 447 U.S. 901, 100 S.Ct. 2981, 64 L.Ed.2d 851 (1980). The decision we cite here is that of the state court on remand.

had given them to his wife. At this point the officers noticed some marks on the car which looked as if someone had tried to jimmy it open. Harris then said that the car belonged to his friend Al, who worked nearby. He suggested that the officers take him to see Al and verify his identity and the ownership of the car. The officers agreed, but they asked Harris to submit to a patdown before getting into their cruiser. The patdown revealed a bricklayer's tool in his pocket which could be used to break into an automobile. Ensuing events led to Harris' conviction of larceny of the tape deck.

■ With regard to the initial confrontation in the parking lot, we held that there had been no seizure:

> It is clear that *at least* until the time of appellant's entry into the police vehicle, the situation was totally lacking in any elements of duress other than those normally inherent in every street encounter between police and citizen. It was only upon appellant's entry into the police vehicle with the preceding pat-down that any claim of duress could conceivably be made.

*Id.* at 1019 (emphasis in original). Read together, *Harris* and *Crowder* establish that we must look to all the circumstances of the encounter, not just the fact that there has been a request for identification, to determine whether there has been a Fourth Amendment violation. Indeed, it is clear from *Harris* that unless there is some element of duress in the encounter, either by force or by a show of authority, a request for identification, without more, cannot be regarded as a seizure within the meaning of the Fourth Amendment. *Accord, United States v. Castellanos, supra.*

■ Guided by these precedents, we turn to the facts of this case. Officer Lauro found appellant, either asleep or unconscious, in a car in a parking lot at 6:45 on a Sunday morning. A check of police records showed that the car was registered to a woman, which appellant plainly was not. In these circumstances the officer "clearly had a right to investigate and inquire as to what the car and its occupant were doing there." *Tyler v. United States,* 302 A.2d 748, 749 (D.C.1973). He tapped on the car window, awakened appellant, and asked him for identification. It was while appellant was looking for his identification that Officer Lauro saw the envelope and cigarette papers in plain view. *See United States v. Burton,* 327 A.2d 308 (D.C.1974). Significantly, none of the "circumstances that might indicate a seizure" cited by Justice Stewart in *Mendenhall, supra,* were present in this case. Officer Lauro was alone, with only a flashlight in his hand. He did not brandish a weapon and did not make any physical contact with appellant. There is nothing in the record to suggest that Lauro's demeanor or tone of voice displayed any show of authority so that a reasonable person might feel compelled to respond. Furthermore, the evidence does not support appellant's argument that the officer parked his cruiser so as to prevent appellant from driving away. The only testimony regarding the relative positions of the two cars was Officer Lauro's statement that they were "approximately ten feet" apart. Appellant's car was lawfully parked in a parking space next to a curb, but there is no evidence suggesting that the police cruiser blocked his way to the exit. We therefore conclude, following *Harris* and *Castellanos,* that the officer's request for identification was not a seizure under the Fourth Amendment.[9]

9. *Brown v. Texas,* 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979), does not require a different result. In *Brown* two police officers stopped the defendant in a neighborhood which had a high incidence of drug traffic because he "looked suspicious" and because they "had never seen that subject in that area before." They had no reason to suspect him of any specific misconduct, nor did the officers believe that he was armed. When he refused to identify himself, the officers frisked him but found nothing; when he persisted in his refusal, they arrested him for violation of a Texas statute which makes it a crime for a person to refuse to give

## III

The trial court held that the seizure of the gun and bullets was lawful because Officer Lauro was standing next to the car, where he had a right to be, when he saw the gun butt in plain view. While this holding appears to be correct, it does not go far enough because the officer would not have seen the gun at all if appellant had not first gotten out of the car at the officer's command. We must therefore determine whether Officer Lauro acted lawfully in ordering appellant out of the car. *See Jones v. United States,* 391 A.2d 1188, 1191–1192 (D.C.1978). We hold that he did because by then he had probable cause to arrest appellant for possession of marijuana.[10]

The uncontradicted evidence[11] established that Officer Lauro, while he was waiting outside the car for appellant to find his identification, saw a small manila envelope and a package of cigarette papers lying next to each other on the console. The officer recognized the envelope as one that is "commonly used to package marijuana."[12] We may assume that no single fact known to the officer at that point would have been sufficient to establish probable cause for an arrest or a seizure; indeed, we have held that the "mere existence" of such an envelope cannot create probable cause to believe that it contains narcotics "merely because it is frequently used for that purpose." *Price v. United States,* 429 A.2d 514, 518 (D.C.1981). In this case, however, we have more: the

package of cigarette papers in close proximity to the envelope.

Even though the envelope alone might not establish probable cause, the combination of the envelope and the cigarette papers, lying on the console only inches apart, made it reasonable for the officer to believe that the envelope contained marijuana. In addition, the officer had ample reason to believe that appellant, a man, was not the owner of the car, for the car was registered to a woman. Appellant's evasive behavior was another factor which the officer could take into account: he had asked appellant twice to identify himself, but appellant had neither produced any identification nor explained his failure to do so. Finally, appellant's lonely presence in the parking lot at 6:45 a.m. on a Sunday was an unusual circumstance in itself, made all the more suspicious by the fact—known to the officer—that there had been recent thefts from cars left overnight on this very lot. Viewing all of these circumstances in combination, as we must,[13] we hold that the officer had probable cause to believe that the envelope contained marijuana. *See, e.g., Thompson v. United States,* 368 A.2d 1148 (D.C.1977). When he looked inside the envelope and found that it did in fact contain marijuana, he then (at the very latest) had probable cause to arrest appellant for violation of the laws which prohibit its possession. The arrest gave the officer the right to search the passenger compartment of the car. *New*

his name and address to an officer "who has lawfully stopped him and requested the information." His conviction under that statute was unanimously reversed by the Supreme Court, which held that, on the facts presented, the officers' initial stop of the defendant was a seizure. "When the officers detained appellant for the purpose of requiring him to identify himself, they performed a seizure of his person subject to the requirements of the Fourth Amendment." *Id.,* 443 U.S. at 50, 99 S.Ct. at 2640. In the instant case, by contrast, there was no restraint on appellant's liberty which would lead us to conclude that a seizure occurred *when the* officer asked him for identification.

10. We cannot avoid ruling on the issue of probable cause because there can be no doubt that the officer's act of opening and looking inside the envelope was a search, which must be justified under the Fourth Amendment. *See United States v. Boswell,* 347 A.2d 270, 273 (D.C.1975).

11. Officer Lauro was the only witness at the suppression hearing.

12. The officer's testimony on this point was unchallenged.

13. *See, e.g., United States v. McCarthy,* 448 A.2d 267, 270–271 (D.C.1982); *Price v. United States, supra,* 429 A.2d at 518; *United States v. Brown,* 150 U.S.App.D.C. 113, 463 F.2d 949 (1972).

*York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981). Consequently, even if he had not seen the gun butt protruding out from under the floor mat in plain view, he could have searched the car and no doubt would have found the gun anyhow.

We therefore hold that the trial court committed no error in denying the motion to suppress.

*Affirmed.*