Reginald K. DUHART, Appellant,

v.

UNITED STATES, Appellee.

No. 89–472.

District of Columbia Court of Appeals.

Submitted Nov. 15, 1990.

Decided April 3, 1991.

Robert E. Schulz, Palo Alto, Cal., appointed by this court, was on brief for appellant.

Jay B. Stephens, U.S. Atty., with whom Lynn Leibovitz, John R. Fisher and Elizabeth Trosman, Asst. U.S. Attys., were on the brief, Washington, D.C., for appellee.

Before ROGERS, Chief Judge, STEADMAN, Associate Judge, and MACK, Senior Judge.

ROGERS, Chief Judge:

Appellant Reginald K. Duhart appeals from his convictions on the ground that the trial court erred in denying his motion to suppress since the police lacked articulable suspicion justifying his seizure and frisk. We agree, concluding that the en banc decision in *Smith v. United States*, 558 A.2d 312 (D.C.1989) (en banc), is dispositive, and accordingly reverse.

I.

On September 28, 1988 at approximately 7:25 p.m., Sergeant Tompkins of the Third District tactical unit, in uniform, was riding his scooter the wrong way down the 1400 block of Fairmont Street, N.W., when he observed appellant display "something" to another man. The 1400 block of Fairmont Street had been the subject of "numerous complaints of illegal narcotics sales." Sergeant Tompkins, who was about 25 feet away from the two men, could not see what the "something" was, but believing that "a narcotics transaction was about to take place or had taken place," he stopped his scooter adjacent to the two men. The two men looked up and appellant put "[w]hatever he was showing" into his pocket and the two men started walking in opposite directions as the officer approached on foot.

Sergeant Tompkins "went to stop [appellant]," and when he was a few feet behind him asked appellant whether he could talk

to him. Appellant stopped and walked back to the officer. As he did, the officer asked him what he had in his pocket. Appellant did not respond, and the sergeant asked him to take his hand out of his pocket. When appellant did not comply, the officer repeated his request, and as appellant responded, "bringing his hand out real reluctantly," according to the officer, the officer grabbed appellant's hand around the wrist to see what he was bringing out of his pocket. As his hand came out of his pocket, the officer "could see that he didn't have anything in his pocket." [1] According to the officer, appellant then "began to act a little funny by turning his body sideways." When appellant did not respond to the officer's question, "What's wrong with you?" the officer said "Well, get up against the car."

The officer testified that because of the way appellant was acting and because he, the officer, was alone, he decided to check to see if appellant had any weapons. Appellant, however, "stiffened his body up and refused to stand so that [the sergeant] could pat him." The officer explained that appellant was "trying to put his right side up against something so I wouldn't frisk him." The officer then turned appellant around—"I used a little bit more force to get him to turn around so that I could pat him down." The officer felt a gun on appellant's right side, took a loaded gun out of appellant's waistband, and told appellant he was under arrest. Nine rounds of ammunition were found in appellant's pocket.

Later, at the police station, another officer asked appellant, "Hey, Shorty, what they got you for? I know you." Appellant then said, according to Sergeant Tompkins, " 'I found a gun in the alley' or something," at which point the sergeant advised him of his *Miranda* rights for the first time, twenty minutes after he had been arrested. Appellant still insisted that he had found the gun in the alley.

On cross-examination Sergeant Tompkins admitted that he did not have a warrant for appellant's arrest, had not received any particular complaints about appellant's conduct, and did not see appellant exchange anything with anyone or hand anything to anyone. He also admitted that he did not see any drugs or money.

Amos Irving testified for the defense that while in the company of several others, he had seen appellant on the evening in question. Irving denied that appellant had showed him anything; he claimed that appellant was "giving us fives or something, like shaking our hands and then putting them back in [his pockets]." He explained that appellant, who did not live in the neighborhood, came there to visit Irving's sister. He also explained that because the area was a "heavy drug trafficking area" a lot of police are around, "checking somebody or harassing somebody. So by us holding a conversation all together, they probably thought we was having a drug traffic—transaction, which we wasn't." According to Irving, the police officer got off his scooter, put his hand on his gun and told everyone to take their hands out of their pockets and everyone did. The officer then approached appellant, who was closest to him, and said, " 'Put your hands on the car,' " and started searching appellant.

Appellant also proffered the witness Felicia Scott and two other witnesses, whose testimony defense counsel admitted would have been cumulative, and the judge, therefore, declined to hear them.

The prosecutor argued that in view of the area and the police officer's experience,[2] he had articulable suspicion under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), to make an investigative stop and a pat-down search of appel-

---

**1.** On cross-examination the officer testified that when he asked appellant to take his hand out of his pocket he saw nothing in his hand, but that he later found nine rounds of ammunition in appellant's pocket.

**2.** Sergeant Tompkins had been a member of the Metropolitan Police Department for 18 years. He was assigned to uniformed scout car for the first nine years, and then to vice for six years, and the last two years as a sergeant for a tactical unit.

lant as a result of seeing appellant "showing an unknown object to another individual and a conversation that was taking place between the two." The judge agreed, noting that the officer's attention had been drawn to the two men, and that upon asking appellant to take his hand out of his pocket "it went from one thing to another." The judge viewed the defense as claiming that nothing was happening while Sergeant Tompkins' testimony was contrary and the judge credited the officer. The judge based his decision on the officer's testimony that (1) he saw appellant, in an area known for high narcotics activity, holding something in his hand which was being observed by another individual and having a conversation; (2) he had years of experience on narcotics cases; and (3) appellant was acting in an "unusual" manner in attempting to shield his right side from the officer's scrutiny.

As a result of a policy of the U.S. Attorney's office against allowing conditional pleas under Super.Ct.Crim.R. 11(a)(2) where a defendant seeks to preserve a suppression issue on appeal,[3] a bench trial followed and appellant was found guilty of carrying a pistol without a license, D.C. Code § 22–3204 (1988), possession of an unregistered firearm, *id.* § 6–2311(a) (1989), and unlawful possession of ammunition, *id.* § 6–2361(3) (1989).

## II.

Appellant contends that the trial judge erred in denying his motion to suppress since the government failed to meet its burden to show specific articulable facts sufficient to demonstrate Sergeant Tompkins' belief that a crime had been committed and that appellant was armed and dangerous, thereby warranting a *Terry* frisk before seeking identification and other information. He further contends that when the officer applied force in order to conduct

a frisk and pat down, he was arrested without probable cause. Therefore, he contends that the weapon and ammunition seized from his person, and the statement he made at the police station, were fruits of an illegal seizure and should have been suppressed.

■ The central inquiry in every *Terry* stop controversy is whether, given the totality of the circumstances at the time of the seizure, the police officer could reasonably believe that criminal activity was afoot. *Terry v. Ohio*, 392 U.S. 1, 29–30, 88 S.Ct. 1868, 1883–85, 20 L.Ed.2d 889 (1968). The threshold question is at what point did the seizure occur. *Terry, supra,* 392 U.S. at 16, 88 S.Ct. at 1877.[4] The standard for determining whether a person has been seized within the meaning of the Fourth Amendment is, in turn, whether "in view of all of the circumstances surrounding the incident a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). A seizure occurs where the officer by force or by show of authority restrains the liberty of a citizen. *Terry, supra,* 392 U.S. at 19 n. 16, 88 S.Ct. at 1879 n. 16. Not every encounter between a citizen and the police involves a "seizure;" some personal intercourse between the police and citizens produce merely consensual encounters. *Id.* "[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions...." *Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 1323–24, 75 L.Ed.2d 229 (1983) (plurality opinion). Rather, other circumstances, such as the physical touching of the suspect, display of a weapon, the use of language or tone of voice indicating compulsion may turn a consensual encounter

---

**3.** Super.Ct.Crim.R. 11(a)(2) permits conditional pleas from any pretrial motion.

**4.** The trial judge did not specifically address the issue of when the seizure had occurred. *See Richardson v. United States,* 520 A.2d 692, 697 n. 5 (D.C.) (trial court should make findings to enable meaningful appellate review), *cert. de-*

*nied,* 484 U.S. 917, 108 S.Ct. 267, 98 L.Ed.2d 224 (1987). Nevertheless, the record provides an ample basis from which to review the circumstances surrounding appellant's seizure. The issue of whether a seizure occurred is a question of law. *Id.* at 696.

into a seizure. *Mendenhall, supra,* 446 U.S. at 554, 100 S.Ct. at 1877. Thus, in *Smith, supra,* the court agreed with the trial court's finding that the police officer's show of authority by announcing that he was a police officer and ordering Smith to stop was "an investigative seizure implicating Fourth Amendment protections." 558 A.2d at 314.[5]

■ Here, Sergeant Tompkins, in police uniform, approached appellant, asked him to take his hand out of his pocket, and when he reluctantly complied, grabbed his wrist. While the requests by the officer that appellant take his hand out of his pocket may be considered merely a pre-seizure consensual encounter,[6] once the officer grabbed appellant's wrist, appellant was seized within the meaning of *Terry.* The government does not disagree.[7] The use of physical force by a law enforcement official is one of the intimidating circumstances listed in *Mendenhall* which indicate seizure. *Mendenhall, supra,* 446 U.S. at 554, 100 S.Ct. at 1877. It states the obvious that at the point a police officer grabs ahold of one's wrist, a reasonable person would not feel free to leave.[8]

■ Accordingly, the issue is whether Sergeant Tompkins had "a particularized and objective basis for suspecting the particular person stopped of criminal activity" when he grabbed ahold of appellant's wrist.

*United States v. Cortez,* 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981); *Terry, supra,* 392 U.S. at 21, 88 S.Ct. at 1880 ("police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion"). The *Terry* inquiry requires the court to evaluate the totality of the circumstances and balance the degree of police intrusion against the level of police justification. 392 U.S. at 21, 88 S.Ct. at 1879–80. The government relies on a series of facts which, it argues, justify the seizure: (1) appellant and another individual were examining an "object" on the street, engaged in what appeared to be a "narcotics transaction," according to Sergeant Tompkins, an officer with 18 years of experience; (2) the area was known to be a high narcotics trafficking area; (3) when the officer approached, appellant and the second person walked in opposite directions; (4) when he saw the officer, appellant "shoved an item into his pocket;" and (5) appellant would not answer the officer's questions and "reluctantly" removed his hand from his pocket after Sergeant Tompkins asked him twice to do so.[9] These are similar to the facts that the court examined in *Smith, supra,* 558 A.2d at 314, and found insufficient to justify a seizure. So too, upon examining each of these facts individually

5. *See also In re T.T.C.,* 583 A.2d 986, 988 (D.C. 1990) (seizure where officer approaches occupants of car, holds gun at side and announces his authority); *Hemsley v. United States,* 547 A.2d 132, 135 (D.C.1988) (seizure where officer orders suspect to keep car parked and orders him to roll down window); *Robinson v. United States,* 355 A.2d 567, 568 (D.C.1976) (seizure where officer grabs suspect by force).

6. *See, e.g., United States v. Barnes,* 496 A.2d 1040, 1045 (D.C.1985) (no seizure where police officer asks suspect to remove his hands from his pockets and asks two questions as this was not more intrusive than asking for identification); *Purce v. United States,* 482 A.2d 772, 777 (D.C.1984) (no seizure when officer tapped on window of car, awakened suspect, and asked for identification).

7. On appeal the government argues only that the officer's initial approach and limited questioning did not constitute a seizure, and that the officer's subsequent actions—when he grabbed appellant's wrist and eventually frisked appel-

lant—were supported by articulable suspicion. The government relies on the area and appellant's "unusual behavior" as viewed through the eyes of an experienced officer to justify the seizure.

8. Because we conclude that the police did not have articulable suspicion under *Terry,* we need not decide whether the officer had probable cause to search and arrest appellant.

9. The trial judge only pointed to two factors which could justify Sergeant Tompkins grabbing appellant's wrist: appellant was in an area known for high narcotics activity, and the sergeant saw appellant holding something in his hand which was being observed by another individual. The third factor relied on by the judge, that appellant was acting in an "unusual" manner in attempting to shield his right side from Sergeant Tompkins' scrutiny, occurred after appellant was seized.

and "taken together with rational inferences," we conclude that they do not constitute reasonable grounds to suspect that criminal activity was afoot. To reach a contrary conclusion would severely circumscribe Fourth Amendment protections.

The first fact relied on by the government, that an experienced officer observed two people examining "something" and concluded that a narcotics transaction had taken place, is insufficient by itself to constitute reasonable suspicion. The basis for justifying a stop under *Terry* is that there is evidence that a criminal undertaking is underway, *i.e.*, when "a police officer observes *unusual conduct* which leads him to reasonably conclude in light of his experience that criminal activity may be afoot." *Terry, supra,* 392 U.S. at 30, 88 S.Ct. at 1884–85 (emphasis added). If the behavior of a suspect is capable of "too many innocent explanations," then the intrusion cannot be justified. *Barnes, supra,* 496 A.2d at 1043. "Presumptions of guilt are not lightly to be indulged from mere meetings." *United States v. Di Re,* 332 U.S. 581, 593, 68 S.Ct. 222, 227–28, 92 L.Ed. 210 (1948). As the court pointed out in *Smith, supra,* there are limits to the inference that an experienced reasonable police officer can rationally draw, and thus, merely engaging in conversation in a public area with a suspected drug dealer is insufficient to justify an investigative stop by the police. *Smith, supra,* 558 A.2d at 315; *see Sibron v. New York,* 392 U.S. 40, 62, 88 S.Ct. 1889, 1902, 20 L.Ed.2d 917 (1968). Likewise, the mere passing of money on a street does not justify a *Terry* stop. *Gray v. United States,* 292 A.2d 153, 156 (D.C. 1972);[10] *see also Haywood v. United States,* 584 A.2d 552, 555 (D.C.1990) (no probable cause where one-way transfer of paper currency and "push off" followed by the two men walking in opposite directions as police approach in response to lookout

for man distributing drugs); *T.T.C., supra* note 5, 583 A.2d at 990–91 (no reasonable suspicion where police observe a man transfer small white object, and enter car where defendant is passenger); *Waters v. United States,* 311 A.2d 835, 837 (D.C. 1973) (no probable cause where police observe student, trying to stuff money into an envelope, approached by a known narcotics addict); *Vicks v. United States,* 310 A.2d 247, 249 (D.C.1973) (no probable cause where police observe the transfer of an "object" but lack a "plain view" identification of the object as illicit narcotics); *Peterkin v. United States,* 281 A.2d 567, 568 (D.C.1971), *cert. denied,* 406 U.S. 922, 92 S.Ct. 1788, 32 L.Ed.2d 122 (1972).

Here, Sergeant Tompkins did not even observe a one-way transfer of money or an object appearing to be drugs. Nor was there a particularized fact from which the sergeant could conclude that what transpired had some connection with drugs. *See Smith, supra,* 558 A.2d at 315. Sergeant Tompkins was 25 feet away from appellant when he observed him displaying "something" to another person. He did not see the object, could not tell what it was, never testified that he thought the object looked like drugs or drug packaging, and he observed no transfer of the object or of anything else. The officer simply observed two individuals standing on a sidewalk examining an object; he did not even testify, as the judge found, that the two people were having a conversation. There is nothing "unusual" or even mildly "suspicious" about such activity, which must occur as a matter of course between individuals every day, and there are innumerable innocent explanations for such behavior. *Barnes, supra,* 496 A.2d at 1043.

The second fact, that the area was known to be a high narcotics trafficking area, does not help to buttress the govern-

---

**10.** The government contends that our decision in *Gray* has lost its vitality after *United States v. Bennett,* 514 A.2d 414, 417 n. 5 (D.C.1986). While *Bennett,* in light of subsequent Supreme Court decisions, did call into question the *Gray* analysis which posited a requirement for a *Terry* stop that "a crime of violence was about to occur or had occurred," *Gray, supra,* 292 A.2d at

156, the decision in *Gray* also rested on a second ground that "the mere passing of money on a street, which the arresting officers characterized as a 'high narcotics area' [does not] give reasonable grounds to conclude that a narcotics transaction is taking place." *Id.* This second ground has not lost its force.

ment's argument. While some of our decisions have held that this is a factor which can be taken into consideration, *Price v. United States*, 429 A.2d 514, 518 (D.C. 1981), " '[t]his familiar talismanic litany, without a great deal more, cannot support an inference that appellant was engaged in criminal conduct.' " *In re D.J.*, 532 A.2d 138, 143 (D.C.1987) (quoting *Curtis v. United States*, 349 A.2d 469, 472 (D.C. 1975)). In *Smith, supra,* the court made clear that "[t]he fact that the events ... took place at ... an allegedly 'high narcotics activity' area does not objectively lend any sinister connotation to facts that are innocent on their face." 558 A.2d at 316 (quoting *Bennett, supra,* 514 A.2d at 419 n. 3 (Mack, J., dissenting)).

Neither does the third fact relied on by the government, that appellant and the other person began walking in opposite directions as the officer approached, add to a finding of reasonable suspicion. The court has recognized "as a general proposition, that flight from authority—implying consciousness of guilt—may be considered among other factors justifying a *Terry* seizure." *United States v. Johnson*, 496 A.2d 592, 597 (D.C.1985). Nevertheless, "flight cannot imply consciousness of guilt in all cases." *Smith, supra,* 558 A.2d at 316. Rather, "the circumstances of the suspect's efforts to avoid the police must be such as 'permit[ ] a rational conclusion that flight indicated a consciousness of guilt.' " *In re D.J., supra,* 532 A.2d at 141 (quoting *Lawrence v. United States*, 509 A.2d 614, 618 (D.C.1986) (Newman, J., dissenting)).

Here, no such conclusion can be drawn. There is no evidence that appellant, upon seeing the officer, "reacted by immediately running from the police." *In re D.J., supra,* 532 A.2d at 141. The evidence does not even suggest that he was leaving at a " 'fast clip' " as in *Smith, supra,* 558 A.2d at 313. Rather, the record indicates that appellant merely attempted to walk away and, importantly, that after the officer asked appellant whether he would answer some questions, appellant stopped and on his own volition walked back to where the officer was standing. Any inference from "flight" that initially might have been made evaporated when appellant walked back to the officer. *Id.* at 317.

Neither does the fourth fact suggested by the government—that appellant upon seeing the officer shoved an item into his pocket—add to its argument. In *Curtis, supra,* 349 A.2d at 472, the court held that the movement by the defendant of his right arm to the left side of his coat upon hearing a person yell "police officers" was not a "furtive gesture" justifying the stop of the defendant. There is no indication that the object that appellant put into his pocket resembled illicit narcotics. *Vicks, supra,* 310 A.2d at 249; *Peterkin, supra,* 281 A.2d at 568. Further, the officer's testimony that he saw appellant put an object into his pocket is somewhat weakened by his testimony, subsequently changed, that upon grabbing appellant's wrist, he did not see anything in appellant's pocket. Nor did the officer have any information suggesting that appellant was dangerous or likely to be armed. *See Lawson v. United States,* 360 A.2d 38, 40 (D.C.1976); *Gilchrist v. United States,* 300 A.2d 453, 456 (D.C. 1973) (citing *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) and *Terry, supra,* 392 U.S. at 1, 88 S.Ct. at 1868).[11]

The final fact relied on by the government, that appellant would not answer the officer's questions and "reluctantly" removed his hands from his pocket after being asked to do so, is basically a variant of the argument that the police had reasonable suspicion based upon appellant's failure to cooperate with the police. The court has consistently rejected such a position in the past. *See Smith, supra,* 558 A.2d at 316. "Citizens have no legal duty to talk to the police ... and an attempt to evade the police, without more, is insufficient grounds to justify a *Terry* stop." *In re D.J., supra,* 532 A.2d at 141–42. A refusal to listen, answer, or cooperate with the

---

11. The government's reliance on *Lewis v. United States*, 399 A.2d 559, 561 (D.C.1979), is misplaced since Sergeant Tompkins had no information about the person with appellant that would have justified frisking appellant.

police does not furnish grounds for an investigatory stop. *Florida v. Royer, supra,* 460 U.S. at 497–98, 103 S.Ct. at 1323–24. Thus, although appellant, after initially cooperating when the officer asked to speak to him, did not thereafter respond to the officer's questions and only "reluctantly" took his hand out of his pocket, appellant's refusal to cooperate cannot be deemed an admission of criminal conduct. Recognition that citizens have no legal duty to speak to the police would be rendered meaningless if the failure to cooperate were held to be a legitimate ground to conduct an investigatory stop.

In sum, we are left with a police officer observing two individuals standing on the sidewalk examining "something." Their conduct was not unusual, nor even suspicious, but activity engaged in by citizens as a matter of course. Sergeant Tompkins' seizure of appellant was not based upon particularized facts, but an "inchoate and unparticularized suspicion or 'hunch.'" *Terry, supra,* 392 U.S. at 27, 88 S.Ct. at 1883. Accordingly, we hold that the seizure was not warranted by the totality of the circumstances, *see Smith, supra,* 558 A.2d at 314, and that the trial judge erred in denying appellant's motion to suppress. Since the evidence seized and appellant's statement were fruits of an illegal seizure, they must be suppressed, *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), and appellant's convictions must be reversed.

STEADMAN, Associate Judge, dissenting:

I appreciate the difficulties to be perceived in an individual examination of each strand, standing alone, of the factual circumstances here. However, I believe that a consideration of the "totality of the circumstances," *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 694–95, 66 L.Ed.2d 621 (1981), can form a cord of sufficient strength to constitute the requisite level of "objective justification," *United States v. Sokolow,* 490 U.S. 1, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (quoting *INS v. Delgado,* 466 U.S. 210, 217, 104 S.Ct. 1758, 1763, 80 L.Ed.2d 247 (1984)).

Beyond the situation in *Smith,* the case before us presents elements of apparent concealment and possible danger. I respectfully dissent.