719 A.2d 491 (1998)
In re R.M.C., Appellant.
No. 96-FS-806
District of Columbia Court of Appeals.
Argued June 9, 1998.
Decided August 27, 1998.
Julia Bollini, Public Defender Service, with whom James Klein and Gretchen Franklin, Public Defender Service, were on the brief, for appellant.
Rosalyn Calbert Groce, Director, Policy and Appeals Branch, Office of the Corporation Counsel, with whom Jo Anne Robinson, Principal Deputy Corporation Counsel, and Robert R. Rigsby, Deputy Corporation Counsel, were on the brief, for appellee.
Before FARRELL and REID, Associate Judges, and GALLAGHER, Senior Judge.
REID, Associate Judge:
Appellant R.M.C. challenges the trial court's denial of his motion to suppress tangible evidence. He entered a conditional plea of guilty to carrying a pistol without a license, in violation of D.C.Code § 22-3204 (1996); possession of an unregistered firearm, *492 in violation of D.C.Code § 6-2311(a) (1995); and possession of unregistered ammunition, in violation of D.C.Code § 6-2361, but reserved his right to appeal. The trial court placed R.M.C. in the custody of the Department of Human Services, and ordered an eighteen months restricted commitment to the Oak Hill Youth Center. R.M.C. filed a timely appeal. The specific question we must decide is whether the legitimate stop of appellant for suspected violation of the Juvenile Curfew Act, without more, justified the additional intrusion of frisking him, placing him against a car, and handcuffing him. We hold that it did not, and that the gun seized as a result of the unlawful bodily intrusion should have been suppressed.

FACTUAL SUMMARY
During the hearing on R.M.C.'s motion to suppress, the government presented the testimony of Officer Michael P. Ursiny of the United States Secret Service Uniformed Division. At approximately 1 a.m. on November 18, 1995, Officer Ursiny and his partner were on "perimeter security" duty at the parking lot in the rear of 1308 Clifton Street, N.W. Their mission was "to provide any kind of security procedures for the officers [who] were conducting a sweep inside of [the] Clifton Terrace [apartments]," in response to "a tip that an individual who was wanted by [the Secret Service Uniformed Division] and [the] Metropolitan Police Department [for armed assault on police officers] ... was ... in the [Clifton Terrace] complex."[1] Officer Ursiny's partner saw three persons walk into the parking lot. In response to a communication from his partner, Officer Ursiny looked up and saw R.M .C. and another male walking with a female. He testified that:
Both male subjects had the girl literally sandwiched in between them. That, alone, I found to be a suspicious behavior; it's not normal to walk down the street in a group and be smashed up against one another, it's just not normal.
As [R.M.C.] and his associates, his friends, when they were approaching my partner and I, I didn't consistently and constantly stare at the three people; I would look and look away, and look and look away. I noticed how [R.M.C.] and the adult gentleman ... displayed a nervousness. A couple of times I made eye contact with [R.M.C.], and he would abruptly look away, which displayed nervousness to me.
When asked by the prosecutor whether "[he] notice[d] anything about [R.M.C.'s] age which drew [his] attention," Officer Ursiny said: "After I noticed his physical behavior with it being dark outside, I wasn't able to establish the fact that he was a juvenile until he was approximately 10 feet away from me." Officer Ursiny "made a stop" on R.M.C. When asked the purpose of the stop, Officer Ursiny stated: "It was a combination of me being able to identify him as a juvenile and the fact that he was out pas[t] the time limit. It was a weekend, so it would have been midnight, and this incident occurred after 1 a.m. in the morning." In response to the question as to whether his intent in stopping R.M.C. was to confirm his juvenile status, the officer stated: "Based on the observations I had made as [R.M.C.] and his associates were approaching my partner and I, based on my experience as a police officer and participation with [the Metropolitan Police Department's] Gun Recovery Unit, I had suspicions already that [R.M.C.] was armed." Government counsel asked what the officer did, and Officer Ursiny replied: "After I established the fact that he was a juvenile, I immediately effected a stop on him." When asked how he made the stop, Officer Ursiny said: "I took one step forward in his direction, reached out with my left hand, I believe, and I grabbed him by his left jacket sleeve.... And spun him around."
Because he believed R.M.C. "was armed," Officer Ursiny "placed him up on top of a car." The officer "checked [R.M.C.'s] waistline on the right side, from the front where his navel would be, around to his right hip." He found nothing. While he was conducting his "brief check of [R.M.C.'s] waistband on *493 the right side," Officer Ursiny's partner engaged in "a scuffle" with the other male. In order "[t]o keep control and to take custody of [R.M.C.] because of the fact that he was a juvenile ...," Officer Ursiny handcuffed him "so [he could] ... help [his] partner." As he placed R.M.C. on the ground, Officer Ursiny noticed he had a 9 millimeter gun because "the gun was dangling, and the butt of the pistol struck the pavement...."[2] Officer Ursiny testified that if he had found no gun on R.M.C., he "would have enforced the Juvenile Curfew Act and taken him into custody." He acknowledged that "[he would] have performed a routine search incident to arrest" had he taken R.M.C. into custody for violation of the Juvenile Curfew Act.
On cross-examination, Officer Ursiny admitted that he made no attempt to determine whether R.M.C. was with a parent or legal guardian, and that he had received no "radio run" or police broadcast concerning R.M.C. He made no effort to determine R.M.C.'s actual age, saying only: "Based on his physical features, it was obvious that he was not [eighteen years of age]." Defense counsel used Officer Ursiny's November 18, 1995 testimony at the probable cause hearing to show that details given during his suppression motion testimony were different from those given during the probable cause hearing. In addition, he attempted to demonstrate that the narrative section of the PD-379 form, which Officer Ursiny completed, differed in detail from his trial testimony. When he was asked about his PD-379 narrative statement that R.M.C. "seemed to clutch his rib cage with his right arm," Officer Ursiny replied: "Clutch or be protective. I didn'twith him being sandwiched up against his female companion, there was no swinging of his right arm, there was no natural movements, which I would describe as clutching." In response to additional cross-examination questions, Officer Ursiny agreed that R.M.C. did not run away from him; the officer did not see R.M.C. put anything in or take anything out of his pocket; the officer did not see a bulge in R.M.C.'s waist, or view anything in his hands. The officer acknowledged that the female in R.M.C.'s company was not being threatened; and that R.M.C. made no threatening gestures to the officer or to anyone else.
After discussion between the trial judge and counsel, the court denied R.M.C.'s motion to suppress. The judge credited the testimony of Officer Ursiny and stated: "I think he stopped him lawfully for an apparent or suspected violation of the curfew law." He added: "I think ... it was not wrong ... for him to stop [R.M.C.] for violating the curfew law, even if he had it in mind that what was more important was that [R.M.C.] may have had a pistol on his person." He continued:
Well, I think the police here were legally permitted and objectively authorized to have stopped [R.M.C.] for an apparent violation of the curfew act. And even if they had another motive in mind, even an overwhelmingly more pressing motive, or a second motive, ... I don't think that the stop was unlawful. I do not think it was unreasonable. And I don't think what occurred, given the circumstances after that, was unreasonable either.
The trial court did not consider "the pistol [to be] the fruit of unlawful search or seizure." After additional discussion with counsel, the trial judge added:
[I] do not find that this case calls upon me to pass upon the constitutionality of the curfew law, and I decline to do so. But I must add ... that it seems to me that the reasonableness of the police's action[s] in enforcing the curfew statute are derived, at least in part, from the law in respect of searches and seizures, as is derived, at least in part, from the Terry[3] standard.
I think that what happened here is that the policeman, when he stopped him under Terry ... could have maintained the status quo and made sure he didn't have a weapon. And in the course of doing it, ... before he'd even completed doing that, he was called away by an emergent situation,... [when] he reasonably turned to assist his partner, and because he was going to *494 do that, he secured [R.M.C.] by cuffing him and was going to move him to a place where he could lay him down on the ground so he couldn't run away. In the course of doing that, the gun came into sight.
And I don't think that anything the police officer did was unconstitutional or excessive or unreasonable; I think it was all reasonable and therefore all lawful. And I think, in particular, that securing him before he could pursue the matter of the curfew law violation was understandable entirely.
After the trial court's ruling on the suppression motion, R.M.C. entered a guilty plea, but preserved his right to appeal the trial court's denial of his suppression motion.

ANALYSIS
R.M.C. contends that: (1) Officer Ursiny did not have a reasonable, articulable suspicion, or probable cause, to believe that he was armed or in violation of the Juvenile Curfew Act; (2) the manner in which Officer Ursiny stopped him violated both the Juvenile Curfew Act and the Fourth Amendment; and (3) the seizure and handcuffing of his person constituted an unreasonable intrusion on his liberty. The government argues that the seizure and handcuffing of R.M.C. were reasonable.
Our review of the trial court's denial of a motion to suppress is mixed. "`[T]he facts and all reasonable inferences therefrom must be viewed in favor of sustaining the trial ruling.'" In re D.A.J., 694 A.2d 860, 864 (D.C.1997) (quoting Peay v. United States, 597 A.2d 1318, 1320 (D.C.1991) (en banc)). Factual findings may be reversed only if they are clearly erroneous. Id. at 865. On the other hand, ultimate questions such as whether the police had reasonable grounds to stop appellant and search his person are reviewed de novo. See Ornelas v. United States, 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) (determinations of reasonable suspicion and probable cause reviewed de novo on appeal).
Substantively, "[t]o justify an investigative detention under Terry v. Ohio, [supra, note 3] ..., the police `must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" Peay, supra, 597 A.2d at 1319-20 (quoting Terry, supra, 392 U.S. at 21, 88 S.Ct. 1868). The facts must "make constitutionally reasonable the police officer's decision to `detain [appellant] briefly in order to investigate the circumstances that provoke[d] suspicion.'" Id. at 1320 (quoting Berkemer v. McCarty, 468 U.S. 420, 439, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)). Moreover, "[t]he scope of the detention must be carefully tailored to its underlying justification." Florida v. Royer, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). A traffic stop, for example, will notwithout morejustify a frisk of the person detained. See Cousart v. United States, 618 A.2d 96, 100 (D.C.1992) (en banc). To justify a self-protective search of the detained person, the police officer must have reason to suspect that the latter "is armed and presently dangerous." Adams v. Williams, 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); Ybarra v. Illinois, 444 U.S. 85, 93, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979) (officer "may conduct a patdown to find weapons that he reasonably believes or suspects are then in the possession of the person he has accosted").

The Initial Stop and the Juvenile Curfew Act
The trial court found that Officer Ursiny stopped R.M.C. for an apparent violation of the Juvenile Curfew Act, D.C.Code § 6-2181, et seq. (1998 Supp.),[4] even though there may have been a second motive, a suspicion that R.M.C. was armed. D.C.Code § 6-2183(a)(1) provides: "A minor commits an offense if he or she remains in any public place or on the premises of any establishment within the District of Columbia during curfew hours." *495 D.C.Code § 6-2182(5) defines a minor as "any person under the age of 17 years, [not including] a judicially emancipated minor or a married minor." Curfew hours extend from eleven p.m. to six a.m. Sunday through Thursday, and from one minute past midnight to six a.m. on Saturday, Sunday and during July and August. D.C.Code § 6-2182(1). Officer Ursiny testified that based upon his observation of R.M.C. and his youthful appearance, he concluded that he was in violation of the curfew law. We agree with the trial court that Officer Ursiny made an initial and lawful stop on R.M.C. for a suspected violation of the curfew law. However, the officer did not follow the mandate of the curfew law before proceeding to frisk R.M.C.
D.C.Code § 6-2183(c)(1) specifically states in part that: "Before taking any enforcement action under this section, a police officer shall ask the apparent offender's age and reason for being in the public place." Officer Ursiny never asked R.M.C.'s age before proceeding to frisk him, place him on the car, and handcuff him. Moreover, he did not inquire as to the reason R.M.C. was out during the statutory curfew hours. Accordingly, under the curfew law, it was improper for the officer to take any enforcement action. Under our case law, Officer Ursiny could take additional action, without asking the statutory questions, only if he had a reasonable and articulable suspicion that R.M.C. was armed and dangerous.

The Suspicion of Dangerousness and the Frisk and Handcuffing
When asked whether his intent in stopping R.M.C. was to confirm that he was a juvenile, Officer Ursiny stated: "Based on the observations I had made as [R.M.C.] and his associates were approaching my partner and I, based on my experience as a police officer and participation with [the Metropolitan Police Department's] Gun Recovery Unit, I had suspicions already that [R.M.C.] was armed." After he stopped R.M.C., the officer "grabbed him by his left jacket sleeve... [a]nd spun him around [and] placed him on top of a car." To determine whether the officer
had an articulable suspicion that criminal activity was afoot and that [R.M.C.] was armed and dangerous[, w]e look to many factors justifying a Terry stop or search for weapons in considering what may constitute an articulable suspicion that criminal activity was afoot or the person was armed and dangerous. These factors include, among others, the time of day, flight, the high crime nature of the location, furtive hand movements, an informant's tip, a person's reaction to questioning, a report of criminal activity or gunshots, and the viewing of an object or bulge indicating a weapon.
Anderson v. United States, 658 A.2d 1036, 1038 (D.C.1995) (citations omitted). In short, we examine whether the police had a reasonable basis to suspect that R.M.C. was in possession of a weapon. Ybarra, supra, 444 U.S. at 93, 100 S.Ct. 338; Duhart v. United States, 589 A.2d 895, 898 (D.C.1991). In this case, the government argues that R.M.C. "was frisked because he was walking strangely and clutching his rib cage which indicated to the experienced officer that he may be armed." The government relies on Womack v. United States, 673 A.2d 603 (D.C. 1996), cert. denied, ___ U.S. ___, 117 S.Ct. 1097, 137 L.Ed.2d 229 (1997), and In re D.E.W., 612 A.2d 194 (D.C.1992) to support its position. This reliance is misplaced.
Womack is a vastly different case. The appellant there entered the home of a woman armed with a gun. He raped her, and she recognized him by his physical features despite the fact that he had a hood over his face. The police found Womack at his grandmother's house and handcuffed him while he was wearing sleeping attire. We concluded that "the use of handcuffs was justified [because] ... the crime of which the defendant was suspected was a violent one and the defendant was reported to have been armed." Womack, supra, 673 A.2d at 609-10.[5] In this case, R.M.C. was not suspected *496 of a violent crime, and the police had received no report that he was armed.
In D.E.W., supra, 612 A.2d at 195, the car in which the appellant was riding "passed through several stop signs." After the officers pulled the car over, D.E.W. was seen "shov[ing] something down the front part of his pants," and later, "held his hands over the area where he was pushing." Id. at 195. Here, in contrast, Officer Ursiny did not see R.M.C. put anything in any part of his body, and saw no bulge indicating that he might be armed. The officer based his frisk of R.M.C. on seeing him walk down the street with another male and a female "sandwiched" between them; his belief that he "displayed nervousness" because when the officer looked at him a couple of times and then looked away, R.M.C. "would abruptly look away"; and his observation that R.M.C. appeared to "clutch or be protective" of his right rib cage because "there was no swinging of his right arm, [and] no natural movement."
Based upon our decision in Anderson, supra, and other cases, we conclude that walking very close to other people, displaying nervousness, clutching or protecting one's side, and failing to swing an arm, individually and together, are insufficient factors to demonstrate a reasonable and articulable suspicion "that criminal activity was afoot [beyond the curfew violation] and that appellant was armed and dangerous." Anderson, supra, 658 A.2d at 1038. This is particularly true where, as here, an officer had no report of criminal activity in which R.M.C. may have been involved, and saw no bulge on R.M.C.'s person indicating the possibility of a weapon.
We reversed the convictions in Anderson even though, inter alia, "appellant quickly walked away from the police; ... placed his hands back in his pocket after being asked to remove them; ... became nervous, rocked back and forth, and got wide-eyed upon questioning." Id. We said: "The Fourth Amendment requires that there must be more than a person being seen in an alley late at night, walking away from the police in a high crime area, who upon being questioned puts his hands back in his pockets and acts in a strange manner." Id. at 1040. In Duhart, supra, we also reversed the convictions even though the police officer saw the appellant showing something to another person in a high crime area; the appellant walked away when the police arrived; had his hands in his pockets, slowly and reluctantly took them out; and "began to act a little funny by turning his body sideways." 589 A.2d at 895-96. We concluded:
In sum, we are left with a police officer observing two individuals standing on the sidewalk examining "something." Their conduct was not unusual, nor even suspicious, but activity engaged in by citizens as a matter of course. [The police officer's] seizure of appellant was not based upon particularized facts, but an "inchoate and unparticularized suspicion or `hunch.'"
Id. at 901 (citing Terry, supra, 392 U.S. at 27, 88 S.Ct. 1868). See also Green v. United States, 662 A.2d 1388 (D.C.1995) (stop and search not justified where police had reports of guns and gunfire; observed appellant placing an object in his coat pocket after the police spotted him; and appellant's attempt to evade the police); Curtis v. United States, 349 A.2d 469 (D.C.1975) (hand motion insufficient to justify Terry stop). Based upon these cases, we are constrained to conclude that Officer Ursiny did not reasonably suspect that R.M.C. was armed and dangerous. The perceived violation of the curfew law, without more, did not provide objective grounds for that suspicion. Therefore, the frisk and placing R.M.C. on the car, and subsequent handcuffing, violated the Fourth Amendment to the Constitution because the degree of police intrusion on R.M.C.'s liberty exceeded the level of police justification.
Accordingly, for the foregoing reasons, we reverse the judgment of the trial court.
Reversed.
NOTES
[1] The suspect was known to the officers by name. Both Uniformed Secret Service officers and Metropolitan Police Department officers were on the scene of the Clifton Terrace Complex, including the parking lot.
[2] R.M.C. had the gun underneath his right arm in a "shoulder rig."
[3] Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).
[4] After R.M.C.'s arrest and conviction, the District of Columbia Juvenile Curfew Act was held unconstitutional by the federal courts of this jurisdiction. Hutchins v. District of Columbia, 942 F.Supp. 665 (D.D.C.1996), aff'd sub nom. Owens v. District of Columbia, 144 F.3d 798 (D.C.Cir. 1998). No issue is presented here as to the continued validity of the statute.
[5] In addition to the rationale used to justify the handcuffing in Womack, "Courts have routinely held the use of handcuffs in the Terry context to be reasonable in situations where suspects attempted to resist police, made furtive gestures, ignored police commands, attempted to flee, or otherwise frustrated police inquiry." Womack, supra, 673 A.2d at 609. No facts have been presented here that parallel any of these situations.