**Aubrey A. DOCKERY, a/k/a Aubrey A. Brown, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 11040.**

District of Columbia Court of Appeals.

Argued May 17, 1977.

Decided April 26, 1978.

Warren C. Nighswander, Public Defender Service, Washington, D.C., for appellant. Frederick H. Weisberg, Public Defender Service, Washington, D.C., at the time the brief was filed, also entered an appearance.

Sallie H. Helm, Asst. U. S. Atty., Washington, D.C., with whom Earl J. Silbert, U. S. Atty. and John A. Terry, and E. Lawrence Barcella, Jr., Asst. U. S. Attys., Washington, D.C., were on the brief, for appellee. Steven D. Gordon, Asst. U. S. Atty., Washington, D.C., also entered an appearance.

Before KERN, NEBEKER and MACK, Associate Judges.

PER CURIAM:

By a three-count indictment filed on September 17, 1975, appellant was charged with first-degree murder while armed (D.C. Code 1973, §§ 22–2401, –3202), first-degree murder, (*id.* § 2401), and possession of a sawed-off shotgun, a prohibited weapon (*id.* § 3214(a)). Appellant moved to suppress evidence and to sever the count charging unlawful possession of the shotgun. These motions were heard pretrial and denied by the court. Trial began on April 22, 1976, and ended on April 27, when the jury found appellant guilty of the lesser-included offense of second-degree murder while armed, and the offense of unlawful possession of a prohibited weapon. On June 14, 1976, appellant was sentenced to a term of 15 to 45 years for second-degree murder while armed, and to a term of one year, to run consecutively, for possession of the prohibited weapon. Appellant challenges on appeal (1) the denial of his motion to suppress, and (2) the denial of his motion to sever the third count of the indictment involving the illegal possession of the shotgun. We affirm.

The government's evidence established the following. During the evening hours of Friday, September 5, 1975, between 8:30 and 9:30 p. m., Detectives Michael Gallahan and Thomas Selby, both Metropolitan Police Department plainclothes detectives assigned to the Second District, were on foot patrol in the Georgetown area of Northwest Washington. They were assigned to give particular attention to street robberies and larcenies from automobiles occurring in the lower end of the Georgetown area. They were standing on the northeast corner of 29th and O Streets when they observed two individuals dressed in jeans, one of whom was wearing a brown scarf and carrying a straw bag. The officers followed the individuals for a short distance until they moved out of sight; the officers then resumed their general patrol of the area. At approximately 11:30 that evening, the same two officers were walking along a foot path near the C & O Canal when they observed a group of between seven and ten white individuals standing along the foot bridge that crosses the canal at 34th Street. The officers observed the individuals passing around what appeared to be a marijuana cigarette, and could smell the odor of marijuana smoke.[1] A young black male joined the whites, but as the officers approached the group began to disperse. A second black individual joined the first, and the two walked off the foot bridge up 34th Street. As they passed, Officer Gallahan told his partner that they were the same two individuals the officers had seen earlier at 29th & O Streets, N.W. They noted that in both instances the two people were walking in a poorly lighted area and that the straw bag one was carrying appeared to be heavier. Believing that a narcotics transaction might have taken place, the officers followed the two as they walked east on M Street, N.W. The officers could observe that one, a man, was walking at a very brisk pace, that he kept looking back nervously and kept shifting the bag from hand to hand as if it were heavy. The officers, aware of the tremendous number of larcenies from automobiles in the Georgetown area, decided to check the identification of the two individuals. Near the intersection of Wisconsin Avenue and M Street, N.W. Officer Gallahan stepped in front of the pair, identified himself and displayed his credentials, while Officer Selby positioned himself next to and slightly behind the man with the straw bag. The officers explained that they were investigating automobile larcenies in the area. The man appeared to the officers to become very nervous, and positioned himself between Officer Selby and the bag. Officer Selby asked the man, now identified as appellant, what was in the bag. Appellant said that it was just his clothing. On the other hand appellant's companion, a woman identified as Ms. Smith, stated that it was her clothing in the bag, and grabbed the bag and opened it. When she did so, Officer Gallahan could see the wood-grained stock of what appeared to be a gun. As Ms. Smith withdrew her hand from the bag, Officer Gallahan could also see the front end of a sawed-off shotgun protruding from the clothing. The officers immediately drew their weapons, searched the bag and patted down appellant and Ms. Smith, recovering a broken down, three-piece sawed-off shotgun from the bag, several shotgun shells from the jacket Ms. Smith was wearing, and a large folding knife from appellant's pocket. Appellant was initially charged with possession of a prohibited weapon (the shotgun) and carrying a dangerous weapon (the knife). After further investigation, appellant was also charged with first-degree murder.

Ms. Smith, appellant's companion on the night in question, testified for the government. She indicated that she and appellant had gone out together for the first time that evening, and had been walking in the vicinity of 24th & P Streets, N.W. when

---

1. Both detectives had been instructed at the Police Academy as to drug identification and recognition; this training included their learning how to detect burning marijuana by smell. Officer Gallahan also testified that he had made arrests for possession of marijuana 20 to 25 times, and that on a number of those occasions marijuana was being smoked at the time of arrest.

appellant began complaining about white people and the way they used black people. Duncan McCrea, a young white man, walked down P Street; appellant pointed him out to Ms. Smith and then grabbed him by the throat. Appellant hit McCrea, who doubled over. Appellant took a knife from his right pocket and stabbed McCrea. At the time, Ms. Smith was standing approximately 2½ feet away. Ms. Smith started running; at some point appellant ran after her. The two went to the bridge at the C & O Canal, where appellant rinsed the knife in the water, folded it up and put it back in his right pocket.[2] He then asked Ms. Smith for her straw bag, and took it with him into some bushes where Ms. Smith could not see what he was doing. When appellant returned, the rolled up jeans jacket that he had been carrying under his arm all evening was in Ms. Smith's bag. Ms. Smith testified that the first time she saw the gun was when the police officers later removed it from her bag.

Appellant presented no evidence at the pretrial hearing. At the close of the hearing, the court concluded that both the initial stop and the subsequent search were reasonable, and that the motion to suppress should be denied.

■ As the trial court recognized, any discussion of the reasonableness of the initial stop in this case must begin with *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In *Terry*, the Supreme Court recognized that a police officer's temporary stop of a person is not violative of the Fourth Amendment if based upon "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21, 88 S.Ct. at 1880. "Each case of this sort will, of course, have to be decided on its own facts." *Id.* at 30, 88 S.Ct. at 1884. In light of *Terry*, this court has considered the following factors in determining whether an on-the-street stop for questioning by a police officer is reasonable: 1) the particular activity of the person stopped for ques-

tioning which the investigating officer has observed; 2) that officer's knowledge about (a) the activity and the person observed and/or (b) the area in which the activity is taking place, and 3) the immediate reaction or response of the person approached and questioned by the officer. *Stephenson v. United States*, D.C.App., 296 A.2d 606 (1972). In considering the facts of this case in view of the *Terry* and *Stephenson* standards, we conclude that the stop in question did not violate appellant's Fourth Amendment rights.

■ Officer Gallahan and Officer Selby were experienced police officers familiar with the Georgetown area. The officers observed appellant and Ms. Smith walking out of Georgetown around 8:30 p.m. and then saw them several hours later at the opposite end of Georgetown, but walking in the same direction as earlier. They observed appellant in the midst of a group of people where he appeared to be smoking marijuana with them, and watched the group disperse at their approach. Aware of the high incidence of automobile larcenies in the area, they watched appellant carrying a now noticeably larger straw bag in a fashion that indicated that it was heavy, walking rapidly and looking back over his shoulder. Under these circumstances, we conclude that the brief stop of appellant, in order to determine his identity and obtain more information, was a reasonable course of action "in light of the facts known to the officer[s] at the time." *Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972).

■ Nor was the subsequent search of the straw bag and the pat-down of Mr. Dockery's person violative of the Fourth Amendment. It is well established that under certain circumstances police officers may seize contraband in plain view without a warrant. Where the initial intrusion which brings the police within plain view of the incriminating article is supported, if not by a warrant then by one of the recognized

---

2. There were flecks of blood on both the knife recovered from appellant and on his left pants pocket, but they were too small to be used for tests to determine the blood's grouping.

exceptions to the warrant requirement, and the discovery of the item is inadvertent, its seizure is valid. *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). Here, where the officers' initial stop was justified in light of *Terry v. Ohio*, *supra*, as soon as the sawed-off shotgun (contraband under the D.C.Code provision) appeared, they had the right, in fact the obligation to seize it.

■ Further, the officers then had probable cause to arrest appellant for possession of a prohibited weapon. And we may assume that when they drew their weapons appellant was effectively under arrest, since he and Ms. Smith would certainly be aware that they were no longer free to leave. *District of Columbia v. Perry*, D.C.App., 215 A.2d 845, 847 (1966). The subsequent search yielding the knife and the shotgun shells was a lawful incident to that arrest.

For these reasons, we conclude that the trial court did not err in determining that appellant's rights were not violated by the acts in question.

■ We turn now to appellant's second contention, that the trial court erred in denying appellant's motion to sever the third count of the indictment charging illegal possession of a sawed-off shotgun. Appellant contends that the evidence involving that charge had no relation to the principle charge of first-degree murder since proof at trial tended to show that the deceased had been stabbed to death with a knife, and that he was therefore prejudiced by the failure to sever.

First of all, it is not clear that the two charges are wholly separate and distinct. The government's theory of the case is that appellant set out for Georgetown armed with both the sawed-off shotgun and the knife; that he chose to use one instead of the other is of no consequence. Ms. Smith's testimony was to the effect that appellant carried his denim jacked rolled up and tucked under his arm from the first time she saw him until after his encounter with the deceased. Shortly thereafter he took her straw bag into some bushes with him, fumbled with it, and returned with the formerly rolled up jacked and the shotgun inside. Although circumstantial, reasonable minds could have concluded from this evidence that appellant had the shotgun in his possession when he assaulted the deceased, and could have used in that assault either the gun or the knife. *See Calhoun v. United States*, D.C.App., 369 A.2d 605 (1977).

In any event, we have recognized that even when "unrelated offenses are charged in an indictment to a single defendant, there is a possibility of some prejudice but, without more, such a joinder is permitted." (Citations omitted.) *Arnold v. United States*, D.C.App., 358 A.2d 335, 338 (1976). Moreover, we cannot find that appellant was unduly prejudiced by the failure to sever. When, as here, the two crimes arose out of a continuing transaction, or the same set of events, the evidence normally would be independently admissible in separate trials. In such a case the prejudice that might result from the jury's hearing the evidence of the other crime in a joint trial would be no different from that possible in separate trials. *Drew v. United States*, 118 U.S.App. D.C. 11, 16, 331 F.2d 85, 90 (1964).

■ A refusal to grant a severance is error only if it constitutes an abuse of discretion. *Arnold, supra; Blunt v. United States*, 131 U.S.App.D.C. 306, 312 n. 16, 404 F.2d 1283, 1289 n. 16 (1968). We find no such abuse of discretion here.

The judgment appealed from is

*Affirmed.*