UNITED STATES, Appellant,

v.

Byron D. BELLAMY, Tor L. Wallace, Dion L. Anderson, Tommy M. Murray, Appellees.

Nos. 92–CO–833 to 92–CO–836.

District of Columbia Court of Appeals.

Argued Dec. 4, 1992.
Decided Jan. 26, 1993.

Stephen P. Anthony, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fischer, Thomas C. Black and Martin Dee Carpenter, Asst. U.S. Attys., Washington, DC, were on the brief, for appellant.

Richard E. Holliday, Jr., Washington, DC, appointed by this court, for appellee Tommy M. Murray.

Stanley K. Foshee, Alexandria, VA, appointed by this court, for appellees Byron D. Bellamy, Tor L. Wallace, and Dion L. Anderson. Mark A. Bradley, Washington, DC, appointed by this court, was on the brief for Byron D. Bellamy. Gary A. Oshinsky, Washington, DC, appointed by this court, was on the brief for Dion Anderson.

Before ROGERS, Chief Judge, FARRELL, Associate Judge, and KERN, Senior Judge.

ROGERS, Chief Judge:

The government appeals [1] the order suppressing physical evidence and a statement of appellee Anderson on the ground that the police unlawfully stopped a car in which appellees were riding and from which the police seized a pistol and ammunition. We affirm.

I

On December 11, 1991, about 11:30 p.m. two undercover police officers driving an unmarked dark blue 1977 Pontiac Firebird stopped at a red light at 13th and I streets, N.W. A brown Maverick with four young African–American males pulled up along the right side of the officers' car at the red light.[2] Officer Andre Minzak, a nineteen year veteran of the Metropolitan Police Department who was assigned to the second district, was driving the officers' car. He looked around his partner at the occupants of the Maverick.[3] According to Officer Minzak,

> The driver of the vehicle looked over to his left at Officer Caine and myself, stuck his finger up in the air as a child might do with attempt playing that he had a gun in his hand, pointed a finger at us and mouth the word Pow as if a round was being fired from that gun and then snickered, looked forward, the light turned and they drove off.[4]

---

1. See D.C.Code § 23–104(a)(1) (1989 Repl.).

2. The occupants were the appellees: Murray was driving, Anderson was the front seat passenger, and Bellamy and Wallace were in the back seat.

3. Officer Minzak testified that he had been trained to always examine the cars around him, searching for "threats," and that he habitually did this whether in uniform or plain clothes.

4. Officer Minzak later said that "sneer" was a better description than "snicker" because he observed a facial gesture but did not hear any sound.

Officer Sean O'Hara Caine, on the police force for two and one half years, who was Officer Minzak's partner, did not mention the gesture during his testimony, and Officer Minzak testified that to his knowledge Officer Caine did not see the gesture. No furtive gestures by the youngsters in the car were observed.

Officer Minzak thought that the gesture was done "in a threatening manner" and that the driver, appellee Murray, "possibly had a weapon in that vehicle or on his person" and might intend to use it, indeed, that Officer Minzak's own life "could possibly be in danger." He suspected the presence of a gun because of the gesture, the late hour (11:30 p.m.), the high-crime area (known for prostitution), and "several recently highly publicized incidents of traffic altercations involving gunfire."[5] The officer explained that his suspicions were aroused "knowing what the climate of behavior on the streets is in the last few years." However, the officer admitted that he did not recall any drive-by shootings in the area in which appellees were stopped. Officer Minzak also admitted that he had not seen a gesture like that before, much less found a gun in a car after seeing a car occupant make such a gesture.[6] He denied that his training had told him to be on the lookout for certain kinds of individuals.[7]

Appellees' car drove off when the light changed. Officer Minzak told his partner that he thought that the situation "bears further checking out," and he and Officer Caine followed appellees for at least five blocks and three turns, from 13th and I past 9th and Pennsylvania and onto 9th street. As they followed the car, they called for a marked police car, which stopped appellees' car on the 200 block of 9th street. At no time had appellees committed any traffic violations. Appellees' car stopped as soon as the marked police car put on its emergency lights.

The officers exited their cars and ordered appellees out of their vehicle. When appellees' car was stopped, there were at least four police cars and seven police officers present. Some of the officers had their guns drawn. The officers forced two appellees to lie down on the street, and the other two appellees to place their hands against a car. When appellees got out of their vehicle, the left rear door was left open, and an officer saw a gun in plain view on the floor board in front of the rear passenger seat behind the driver. The police asked appellees who owned the gun, but no one responded. The officers found ammunition in a white pill bottle on the rear seat. After appellee Anderson had been read his *Miranda*[8] rights, Officer Caine asked who owned the gun, and appellee Anderson said the gun was his. Appellee Murray owned the car.

Appellees were each charged with carrying a pistol without a license, possessing an unregistered firearm, and unlawfully possessing ammunition. D.C.Code §§ 22–3204(a) (Supp.1992), 6–2311(a) (1989 Repl.), 6–2361 (1989 Repl.). They filed motions to suppress, and following an evidentiary hearing the trial judge found:

5. The officer explained that he was referring to random drive-by shootings in the city and to "[t]raffic altercations that resulted in violence with the use of a handgun or firearm."

6. The officer stated that he had previously stopped a car whose occupant "flipped the bird" at him, for violating a statute which prohibits obscene gestures, but conceded that that situation was "entirely different" from the instant case. In the "bird" case, moreover, the officer had only given the gesturer a stern verbal warning.

7. Appellee Anderson's written motion to suppress argued that the police had stopped the car "because its occupants fit an unconstitutional profile, namely four African–American youths traveling in ... a predominantly white area, at night." The prosecutor argued that because the officer had denied he was trained to follow a profile, there was no evidence of racial bias in the case. The prosecutor maintained that an interaction involving "four African American young men in a car, one of whom makes a sign of a gun and says 'pow' to a white man in a car alongside is wholly without the bounds of consideration of race." Rather, the prosecutor argued, it was "the threatening furtive gesture ... along with the temperament of the city.... that would raise apprehension even as a reasonable person."

8. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

I think the operative facts are very straight forward. On a day in the District of Columbia a police officer with a partner in an unmarked car stopped at a traffic light. The defendants occupy another car which pulls to the light. The driver of the car occupied by the defendants *leans over and with hand in the symbol of a pistol points it at the officers* and mouths a word the officer understands to be pow. There's nothing in the record to suggest that the defendants knew that the individuals in the car, who were objects of that crude and unfortunate gesture, were police officers. I suggest that if they were, that there might be probable cause to find that the offense of assault of a police officer had been committed under the theory of intimidation as that action is prohibited under the assault statute.

The Government argues that there is reasonable basis for the officer to stop *the car because of threats. It is significant that when the light changed the cars pulled off without further incident. . . .*

I don't find the threat. I think under other circumstances to make such a rude, crude and inappropriate gesture could, as is it was relatively roundly agreed, have resulted in these four gentlemen being shot had the person in the car had a weapon or if the incident had escalated and Mr. Anderson had taken his weapon and there had been an exchange of shots as all too frequently occurs in the District of Columbia.

If the incident had, as there was some discussion, racial animosity between the four young African American men and two White officers, I'm very sorry. It's another sad day for race relations.

I grant the motions to suppress.[9]

## II

■ The government contends that the trial judge erred in granting the suppression motions because the police had grounds to make a *Terry*[10] stop, that stop was not impermissibly intrusive, and the physical evidence, as well as appellee Anderson's statement, were lawfully obtained. More particularly, the government argues that the police had grounds for a brief investigative detention of appellees' car as a result of "the combination of two factors: (1) the threatening and intimidating conduct of appellee Murray came very close to being a crime in itself, and (2) Murray's conduct gave the officers an objective basis to suspect that there was a gun in the car." The government argues, taking no issue with the trial judge's factual findings, that the trial judge's legal conclusion regarding the stop "placed an undue limit on the officers' ability to investigate suspected criminal activity."[11] Appellees respond that the police did not have

---

**9.** During discussion with counsel, the trial judge observed that appellees were fortunate that Murphy's gesture had been made to two people who turned out to be police officers:

—to make a gesture in a high crime neighborhood in a major urban center in the country today could have resulted in another result. And instead of the enjoyment of Fourth Amendment litigation, each of these four gentlemen might be dead. And that I'm prepared to rule.

But on the question of law, there's a body of law that says a police officer has to have a considerably thicker skin than others because police officers are subjected to all manner of rude treatment.

**10.** *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

**11.** The government's argument continues to the effect that the gesture "was surely a threatening

and intimidating gesture to an ordinary person," and that the officer's perception of the gesture was

completely reasonable, since an ordinary person would instantly fear that the man gesturing in that way might well have a real gun within reach. One would surely wonder and suspect that that would be the case. That suspicion is what gave the police grounds to further investigate to determine if Murray actually had a gun and whether he was about to use it against the officers or others.

Moreover, the government argues, the trial judge "appreciated the menacing and provocative nature of such a gesture" in his finding that it might have constituted an assault on a police officer had the officers been in uniform, and in his observation that "under the circumstances," but for the fact that Minzak and Caine were trained police officers, the gesture could have resulted in an exchange of gunfire "as all too frequently occurs in the District of Columbia."

reasonable articulable suspicion of wrongdoing sufficient to stop them, and further, that even if stopping the car were a permissible *Terry* stop, it became an arrest without probable cause when seven officers, some with guns drawn, surrounded the car, ordered appellees out of the vehicle, and placed two appellees on the ground and the two other appellees against the car.[12]

■■■ As recently recapitulated, this court independently reviews the trial court's conclusion of whether articulable suspicion existed, but defers to the trial court's "underlying factual findings." *(Marvin) Brown v. United States*, 590 A.2d 1008, 1020 (D.C.1991) (citations omitted). The government concedes, for purposes of these consolidated appeals, the standing of appellees to raise Fourth Amendment suppression arguments. *See generally Lewis v. United States*, 594 A.2d 542, 544–45 (D.C.1991) (requirements for standing to protest search), *cert. denied*, —— U.S. ——, 112 S.Ct. 1225, 117 L.Ed.2d 460 (1992).

The Supreme Court made clear many years ago that:

> The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances. And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search "warrant a man [or woman]

of reasonable caution in the belief" that the action taken was appropriate? Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result this Court has consistently refused to sanction.

*Terry, supra*, 392 U.S. at 21–22, 88 S.Ct. at 1880 (footnotes and citations omitted). Accordingly, the Court concluded that to justify a particular official intrusion, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21, 88 S.Ct. at 1880. The Supreme Court instructs that "in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his [or her] inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he [or she] is entitled to draw from the facts in light of his [or her] experience." *Id.* at 27, 88 S.Ct. at 1883 (citation omitted). *See also Delaware v. Prouse*, 440 U.S. 648, 663, 99 S.Ct. 1391, 1401, 59 L.Ed.2d 660 (1979) (vehicles cannot be stopped in officers' unrestricted discretion; there must be at least reasonable suspicion that suspects have violated the law, or neutral, non-discretionary checkpoints).[13] This court evaluates the lawfulness of *Terry* stops in light of the particular activity of the person stopped; the officer's knowledge about the activity, the person, and the area; and the immediate reaction of the person approached by the officer. *Dockery v. United States*, 385 A.2d 767, 770 (D.C.1978) (citation omitted).

This is not a case in which the police had any prior knowledge of the people inside of the car; nor did the police have any subse-

---

**12.** Because of our holding, we do not reach the issue of whether the amount of force used by the police would have transformed a *Terry* stop into an arrest.

**13.** *See also Pennsylvania v. Mimms*, 434 U.S. 106, 109, 98 S.Ct. 330, 332, 54 L.Ed.2d 331 (1977) ("Reasonableness, of course, depends 'on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers'") (quoting *United States v. Brignoni–Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 2578, 45 L.Ed.2d 607

(1975)); *Adams v. Williams*, 407 U.S. 143, 145, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972) ("The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape.... *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response," and thus, the officer could remove gun from the defendant's pants based on an informant's tip that the suspect was armed) (citation omitted).

quent knowledge of those persons as a result of information obtained from a police computer check before the car was stopped. There was no violation of the traffic laws by appellees, no evasive action by appellees when the marked police car put on its overhead lights and ordered the car to stop, nor any gesture by an occupant of the car other than Murray's hand gesture. There also was nothing to suggest that appellees knew that the undercover officers were policemen. Thus, the only elements available to support Officer Minzak's suspicion that appellees had a gun were the driver's gesture and mouthed word "pow," the time of night, the "high-crime" area, and the officer's experience and knowledge of past drive-by shootings under different circumstances.

The trial judge could properly conclude that appellee Murray's gesture did not give Officer Minzak reasonable articulable suspicion that appellees had a gun or intended to use one. The gesture was, as the trial judge found, rude, crude and inappropriate, but it did not constitute a threat. *See* page 18, *infra*. There was no context or motive on which the police officer could rely to infer that appellee Murray or the other appellees might have a gun in the car or that he (or they) might actually intend to act on any insult or gesture made "as a child might do." [14] This circumstance is in sharp contrast to cases on which the government relies. [15] The gesture was not only an isolated incident, but it occurred in circumstances totally unlike those in which a police officer has articulable suspicion that a person has a weapon as a result of seeing either a bulge in an already-stopped suspect's clothes or a furtive gesture as if to hide a weapon. [16] Murray's gesture was

---

**14.** While Officer Minzak's conduct in staring at appellees might give them a motive to insult or even assault him, the context in which appellee Murray's gesture occurred, unlike the cases relied on by the government, *see* note 15, *infra*, did not provide the missing objective basis for an inference that appellees had a gun.

**15.** *See United States v. Walker,* 835 F.2d 983, 985, 987–88 (2d Cir.1987) (defendant's handgun-mimicking gesture and many other verbally and physically intimidating and abusive behaviors, viewed in the light most favorable to the government, provided sufficient evidence to allow a jury to convict defendant of intimidating his probation officer); *United States v. (Maurice) Smith,* 973 F.2d 1374, 1375, 1377–78 (8th Cir. 1992) (express death threat where, in response to question whether his hold-up was a joke, defendant put his hand under his coat, making it appear that he was holding a gun, and stated "you don't want to find out;" also, threats inherent in demand for money); *United States v. Balzano,* 916 F.2d 1273, 1291–92 (7th Cir.1990) (intimidation of witness about to give damaging testimony where defendant's "hand gestures mimick[ed] the slashing of a throat and the threat of a gun"); *United States v. Rocha,* 916 F.2d 219, 229–31 (5th Cir.1990) (characterizing as a "death threat" the defendant's moving a finger across his throat and mouthing the words "you are dead" to a witness while in a courtroom; issue considered only in connection with motions to sever on grounds of prejudice), *cert. denied,* —— U.S. ——, 111 S.Ct. 2057, 114 L.Ed.2d 462 (1991); *cf. United States v. Mickens,* 926 F.2d 1323, 1328–29 (2nd Cir.1991) (defendant made a handgun gesture in court; issue was whether a witness could testify to having

observed this behavior, which showed attempt to threaten witness and therefore consciousness of guilt), *cert. denied,* —— U.S. ——, 112 S.Ct. 940, 117 L.Ed.2d 111 (1992); United States Sentencing Guidelines, § 2B3.1(b)(2)(d) comment 8 (1990) (death threat can be in form of gesture).

**16.** *See In re D.E.W.,* 612 A.2d 194, 196 (D.C. 1992) (defendant's attempt to shove something into front of his pants was "not simply a 'gesture,'" but occurred as police "were about to conduct an investigation" of a stopped car); *Byrd v. United States,* 579 A.2d 725, 729 (D.C. 1990) (bulge in jacket led officer to believe passenger was armed); *United States v. Bennett,* 514 A.2d 414, 416 (D.C.1986); *Jeffreys v. United States,* 312 A.2d 308, 309–10 (D.C.1973); *cf. Mimms, supra* note 13, 434 U.S. at 111–12, 98 S.Ct. at 334 (bulge in driver's jacket "permitted the officer to conclude that [driver] was armed and thus posed a serious and present danger to the safety of the officer," officer could search defendant already lawfully stopped); *Terry, supra* note 10, 392 U.S. at 27, 88 S.Ct. at 1883 (defendants' conduct consistent with persons contemplating daylight robbery, and hence, prudent person warranted in thinking petitioner was armed). *Compare Jones v. United States,* 391 A.2d 1188, 1189, 1191 (D.C.1978) (held unlawful stop where police only saw two men sitting in a car late at night in a high-crime area and one man moved as if to hide something as the police approached); *Tyler v. United States,* 302 A.2d 748, 749 (D.C.1973) (defendant's furtive gestures insufficient to show that criminal activity was afoot, or to allow search of car of already-stopped suspect, although combined with a late hour (3:30 a.m.) and facts that defendant was passenger in a parked car in an alley,

not even furtive; he did not act as if he were trying to hide anything from the officer's view, but instead directed his gesture towards the officer. Furthermore, upon making the gesture, appellee Murray turned away, waited for the traffic light to change, and drove off when the light turned green, hardly circumstances suggesting that he intended to act on his insult to the undercover officers. There is not even the aspect of flight present in the instant case.[17] Moreover, how others might react if appellee Murray were to repeat his rude gesture in the future could not provide the police with articulable suspicion that Murray had a gun.[18] Nor did

Officer Minzak testify that he suspected appellees of criminal activity but was unsure of exactly which crime was involved; rather he testified that he had a single, clear suspicion that appellees had a gun and might use it.[19] However, in the absence of a threat, which the trial judge found was nonexistent, the officer's suspicion that appellees had a gun lacked a reasonable and articulable basis.[20]

The other factors—the time of night, the area of the city, and the officer's experience with the area or type of crime—are neither individually dispositive nor, in combination, sufficient to support a reasonable suspicion that there was a gun in the car.[21]

he became nervous when speaking with an officer, and car may have been in violation of parking regulations).

**17.** *See (John) Smith v. United States,* 558 A.2d 312, 316–17 (D.C.1989) (en banc) (citations omitted); *In re D.J.,* 532 A.2d 138, 142 (D.C. 1987).

**18.** This also is not a case in which the officers had reasonable articulable suspicion that appellees were going to commit a crime in the future. *See Terry, supra,* 392 U.S. at 6, 22–23, 88 S.Ct. at 1872, 1880–81 (officer saw defendants repeatedly look in store window, thought they were planning hold-up); *cf. United States v. Abokhai,* 829 F.2d 666, 670 (8th Cir.1987), *cert. denied,* 485 U.S. 907, 108 S.Ct. 1082, 99 L.Ed.2d 241 (1988); *United States v. Martinez,* 808 F.2d 1050, 1054 (5th Cir.1987), *cert. denied,* 481 U.S. 1032, 107 S.Ct. 1962, 95 L.Ed.2d 533 (1987).

**19.** The government cites Florida cases as holding that officers could stop suspects engaged in suspicious conduct even if the police were not sure exactly which crime the offenders were committing, but these cases do not directly support that proposition. *See Hooper v. Florida,* 440 So.2d 525, 526–27 (Fla.App.1983) ("the possibility of attempted burglary or trespass was mentioned as the subject of the founded suspicion," and officer was acting on a citizen's report of activity, not just officer's own "hunch"); *Horton v. Florida,* 375 So.2d 1112, 1113 (Fla. App.1979) (officer suspected that beer delivery truck traveling at midnight had been stolen or was transporting marijuana), *cert. denied,* 386 So.2d 638 (1980).

**20.** *See Dubart v. United States,* 589 A.2d 895, 899 (D.C.1991) (*Terry* stop cannot be justified if defendant's behavior has "too many innocent explanations") (quoting *United States v. Barnes,* 496 A.2d 1040, 1043 (D.C.1985)); *cf. In re D.J., supra* note 17, 532 A.2d at 142 (defendant's

evasive action did not provide reasonable suspicion for a *Terry* stop because "it may be inspired by any number of innocent reasons. Such ambiguous conduct may not serve, of itself, as a basis for seizure") (citations and footnote omitted). *But see In re D.E.W., supra* note 16, 612 A.2d at 197 (where passenger in lawfully-stopped car attempted to shove something down his pants, "[t]he issue is whether the officer had an articulable suspicion, not whether [defendant's] actions could be construed as innocent behavior") (citation omitted).

**21.** The time of day: *(William) Brown v. United States,* 546 A.2d 390, 393 (D.C.1988) (late hour); *Curtis v. United States,* 349 A.2d 469, 471–72 (D.C.1975) (night hour, about 7:30 p.m., not determinative, not unusual for people to be walking around at that time); *United States v. Laing,* 281 U.S.App.D.C. 266, 271, 889 F.2d 281, 286 (1989), *cert. denied,* 494 U.S. 1008, 110 S.Ct. 1306, 108 L.Ed.2d 482 (1990) (late hour).

The area: *Brown v. Texas,* 443 U.S. 47, 52, 99 S.Ct. 2637, 2641, 61 L.Ed.2d 357 (1979) (high drug crime area not determinative); *Dubart, supra* note 20, 589 A.2d at 900 (high crime nature of area not determinative); *Matter of T.T.C.,* 583 A.2d 986, 990 (D.C.1990) (high crime area) (citations omitted); *In re D.J., supra* note 17, 532 A.2d at 143 (high drug crime area considered, but not enough alone for reasonable suspicion) (citation omitted); *Curtis, supra,* 349 A.2d at 472 (high crime area, night hour, "[t]his familiar talismanic litany, without a great deal more, cannot support an inference that appellant was engaged in criminal conduct") (citations omitted).

The officer's experience: *Brown v. Texas, supra,* 443 U.S. at 52 n. 2, 99 S.Ct. at 2641 n. 2 (citations omitted); *Dockery, supra,* 385 A.2d at 770 (officers were experienced and familiar with the area, area known for "automobile larcenies"); *Jeffreys, supra* note 16, 312 A.2d at 311 ("officer's knowledge" about the location) (citation omitted).

The "late hour" was only 11:30 p.m., but in any event, this factor appears usually to focus on the officer's potential vulnerability rather than the intent of the suspect.[22] The "high crime area" was known for prostitution, not drugs or violence.[23] While Officer Minzak was aware of drive-by shootings in the past several years in the District, ["all over the city"] he knew of none in the relevant area nor any that had arisen under like circumstances.

■ Officer Minzak's experience is not a significant factor here.[24] Although the officer was knowledgeable of the particular area of the city, that particular area was known for prostitution, an offense unrelated to appellees' conduct and the officer's suspicions. Indeed, the officer's testimony was tantamount to a concession that nothing in his prior experience provided a reason for him to conclude that appellees had a gun in their car. He admitted that he had never known such a gesture to lead to

a gun. He denied that as a result of his training he was relying on a profile for certain kinds of individuals. His reliance on the character of the streets and what has been happening recently is not the same as the particularized, individualized suspicion that is required under *Terry, supra,* 392 U.S. at 21, 22, 88 S.Ct. at 1879, 1880. *Cf. Matter of A.S.,* 614 A.2d 534, 537–38 (D.C.1992); *Galberth v. United States,* 590 A.2d 990, 997–98 (D.C.1991) (general law enforcement concerns do not provide sufficient grounds for the police to stop a car) (citing *Delaware v. Prouse, supra,* 440 U.S. at 659 n. 18, 99 S.Ct. at 1399 n. 18). Nor were there objective circumstances, based on information about appellees' other activity, that would permit the officer to stop the car because a gun was likely to be involved.[25] Other cases cited by the parties concern searches of passengers in lawfully stopped cars, and are not helpful here.[26] The factors present here are individually and collectively less

The totality of circumstances: *United States v. Sokolow,* 490 U.S. 1, 8, 109 S.Ct. 1581, 1586, 104 L.Ed.2d 1 (1989) (several facts were very unusual but "[a]ny one of these factors is not by itself proof of any illegal conduct and is quite consistent with innocent [activity]. But we think taken together they amount to reasonable suspicion") (citations omitted); *Terry, supra* note 10, 392 U.S. at 22, 29–30, 88 S.Ct. at 1880, 1884; *Peay v. United States,* 597 A.2d 1318, 1320 (D.C. 1991) (citations omitted); *Dubart, supra* note 20, 589 A.2d at 897.

**22.** *See Jones v. United States,* 391 A.2d 1188, 1191 (D.C.1978) (fact that officer encountered two men sitting in car at approximately one a.m. in a high crime area did not justify *Terry* stop); *cf. Tyler, supra* note 16, 302 A.2d at 750 (warrantless search of lawfully-stopped defendant's car, 3:30 a.m. hour and other factors not enough to justify search or show that criminal activity was afoot).

**23.** *Compare United States v. Trullo,* 809 F.2d 108, 111 (1st Cir.1987) ("combat zone," known for prostitution and violent crime and drugs, still not sufficient alone to justify *Terry* stop), *cert. denied,* 482 U.S. 916, 107 S.Ct. 3191, 96 L.Ed.2d 679 (1987).

**24.** *See Dubart, supra* note 20, 589 A.2d at 899 (noting that "there are limits to the inference that an experienced reasonable police officer can rationally draw") (citing *(John) Smith, supra* note 17, 558 A.2d at 315; *Sibron v. New York,* 392 U.S. 40, 62, 88 S.Ct. 1889, 1902, 20 L.Ed.2d 917 (1968)).

**25.** *See United States v. Clipper,* 297 U.S.App.D.C. 372, 973 F.2d 944, 951 (1992) (where police have anonymous tip, suspected gun crimes may be treated differently from suspected drug offenses because the former are more likely to involve immediate danger to others); *see also United States v. (Morris) Johnson,* 540 A.2d 1090, 1091–92 (D.C.1988) (informer's tip); *cf. Tyler, supra,* 302 A.2d at 750 (search of stopped defendant, distinguishing situation where police have been told that suspect has gun); *United States v. Mason,* 450 A.2d 464, 465, 466 (D.C.1982) (officer's right to stop suspect not disputed, tip that suspect's bag contained gun, officer could search bag). *But see Peay, supra* note 21, 597 A.2d at 1321 ("as has often been observed, drugs and weapons go together") (citing, *inter alia, Irick v. United States,* 565 A.2d 26, 31 (D.C. 1989)); *cf. Matter of T.T.C., supra,* 583 A.2d at 988 & n. 2; *United States v. (Orson) White,* 208 U.S.App.D.C. 289, 295–96 & n. 29, n. 30, 648 F.2d 29, 35–36 & n. 29, n. 33 (1981) (drawn guns did not transform stop into arrest, officer concerned that defendant, like many other drug offenders the officer had arrested, was armed, citing statistics), *cert. denied,* 454 U.S. 924, 102 S.Ct. 424, 70 L.Ed.2d 233, 235 (1981).

**26.** *See United States v. Mitchell,* 293 U.S.App. D.C. 24, 28–29, 951 F.2d 1291, 1295–96 (1991) (after car stopped for traffic violations, actions of passenger led officer to believe passenger was hiding a weapon), *cert. denied,* —— U.S. ——, 112 S.Ct. 1976, 118 L.Ed.2d 576 (1992); *Byrd v. United States,* 579 A.2d 725, 729 & n. 9 (D.C. 1990) (same, officers saw bulge in passenger's pocket).

probative than those in cases where there was reasonable articulable suspicion.[27]

■ The government's contention that the police could stop appellees' car to investigate because "the threatening and intimidating conduct of appellee Murray came very close to being a crime in itself" fails on this record and thus cannot explain how the officers had reasonable articulable suspicion. Officer Minzak testified that he stopped appellees' car because he thought they might have a gun, and not because he thought that appellee Murray's gesture was itself a crime. In fact, the officer distinguished as "entirely different" appellee Murray's gesture from an obscene gesture, which, the officer claimed, in and of itself would have violated a statute. In addition, the trial judge found that there was no evidence that appellees knew that officers Minzak and Caine were police officers, and therefore no probable cause to suspect them of assaulting a police officer under a theory of intimidation.[28]

The government concedes that it did not argue in the trial court and now "do[es] not press it as a reason to reverse" that appellee Murray's gesture and the mouthed word "Pow" may have violated D.C.Code § 22–507 (1989 Repl.), which forbids threats to do bodily harm. The government admits that appellee Murray's gesture "fell just shy of" threat-type assault prohibited by D.C.Code § 22–504 (1989 Repl.). The government suggests that Murray's gesture and mouthed word "arguably" violated the disorderly conduct statute, D.C.Code § 22–1121 (1989 Repl.). But the trial judge's findings regarding the nature of the gesture make clear that the judge did not find facts which would bring the gesture within the threats, assault, or disorderly conduct statutes. While the judge concluded that appellee Murray's gesture was foolish thing to do, the judge suggested that police officers were trained to take such insults without reacting so as to cause a disturbance. *See* notes 9 & 11, *supra.* In its reply brief the government argues that "[p]lenty of ordinary citizens would feel very threatened by appellee Murray's gesture and the mouthed word 'Pow' in that location at that time of night." (citing *United States v. Baish,* 460 A.2d 38, 42 (D.C.1983) (threat evaluated in terms of how it would affect ordinary recipient)). The fact that Officer Minzak may have interpreted the gesture, in the government's words, "as genuinely threatening and suggestive of the possibility of a gun's presence in appellees' vehicle," does not withstand the objective scrutiny that the Fourth Amendment requires, *Terry, supra,* 392 U.S. at 21–22, 88 S.Ct. at 1879–80, and the trial judge applied in evaluating the officer's credibility. *See (Marvin)*

---

27. *See (William) Brown v. United States,* 546 A.2d 390, 391–393 (D.C.1988) (stop of defendant in an area known for street robberies, at 1:00 a.m., where defendant and two companions walked hurriedly from a dimly-lit street, dressed in casual clothing which would not have been allowed at the only public establishment on the block, entered a car, and exceeded the speed limit, and one person crouched in the back seat periodically peering backwards at the police); *Stephenson v. United States,* 296 A.2d 606, 610 (D.C.1972) (police saw men running at 4:30 a.m. in commercial area where rooftop burglaries had occurred); *Laing, supra* note 21, 281 U.S.App.D.C. at 268, 271, 889 F.2d at 283, 286 (police had tip that a specific apartment's occupants were armed, officers saw defendant flee when he saw police and attempt to enter that apartment, shoving his right hand into the front of his pants, at 12:30 a.m. in a high-crime area); *see also Little v. United States,* 393 A.2d 94, 95–96 (D.C.1978) (dictum) (where defendant and two others in his car were observed driving slowly, watching people on the sidewalks, occa-

sionally stopping to "watch[ ] other people park cars, get out, and go into houses," "[h]ad [police officers] stopped the car to make inquiry of the occupants and to ascertain their identifications, they would have been justified;" car had, in fact, stopped when police approached). *Compare (John) Smith, supra* note 17, 558 A.2d at 313–14 (insufficient basis for a *Terry* stop where officers saw defendant speaking with two suspected drug dealers in a high drug-trafficking area, officers knew that dealers often have a third partner to hold the money, and defendant walked away as a police car arrived).

28. *Cf. (John) Smith, supra* note 17, 558 A.2d at 317 (officer could not reasonably have assumed that defendant knew he was a policeman, since officer was in plain clothes and unmarked car). *But see Bennett, supra* note 16, 514 A.2d at 416 & n. 3 (officer could reasonably believe that suspect feared or thought undercover officers were police officers because their actions were consistent with those of police officers).

*Brown, supra,* 590 A.2d at 1020 (citation omitted); *Matter of B.E.W.,* 537 A.2d 206, 207 (D.C.1988) (citation omitted).

The trial judge's findings regarding the nature of the gesture make clear that appellee Murray's gesture was insufficient to objectively cause a reasonable person to believe that appellees had a gun in the car.[29] The gesture was not so linked to gun possession as to lead to that inference.[30] It was not a "furtive gesture" of hiding or holding a weapon. Nor did the officers see any physical sign of a concealed weapon, such a bulge in one of the appellees' clothing. The other factors, such as time of night, the area, and the officers' experience, are insufficient to bolster the observation of appellee Murray's

gesture to provide reasonable articulable suspicion that he had a gun. The government's argument that Officer Minzak "testified that his judgment was that Murray would not have made [the gesture] without having immediate access to a real gun" is a judgment that was simply unsupported by the objective evidence or reasonable inferences based on facts known by the officer.

Accordingly, we affirm the order granting the motions to suppress.

---

**29.** Of course, had there been an objective basis for the officers to think that appellees had a gun, the fact that appellees' car drove away once the traffic light changed to green would not have negated the officers' articulable suspicion. *See Peay, supra* note 21, 597 A.2d at 1322 (rejecting argument that a defendant's walking away after initial contact with officer indicated that the defendant would not attack officer with any weapon that might have been concealed in his closed hand) (citation omitted); *Jeffreys, supra* note 16, 312 A.2d at 310 (officers' right to stop defendants "did not evaporate merely because they deferred such action until the [defendants'] car started to go") (citations omitted).

**30.** *Cf. In re D.J., supra* note 17, 532 A.2d at 142–43 (suspect's putting his hands in his pockets when he saw officers was "a universal action which could hardly be called suspicious").